El Juez Asociado Señor Martínez Torres
emitió la opinión del Tribunal.
La parte peticionaria, el Sr. Giovanni Rodríguez Vélez, su esposa Gidalsy Rivera Hernández y la Sociedad Legal de Bienes Gananciales compuesta por ambos, nos solicitan la revisión de un dictamen del Tribunal de Apelaciones que confirmó una sentencia del Tribunal de Primera Instancia, Sala Superior de San Juan, en la que se desestimó una demanda por daños y perjuicios e incumplimiento de contrato. Mediante esa sentencia, el foro primario acogió una moción de sentencia sumaria presentada por Bahía Park, S.E. (Bahía Park), en la que se aseguró que el con-trato de corretaje, de tipo abierto, que se alegaba existía entre las partes, era nulo por carecer de fecha de venci-miento, contrario a lo que exige el Art. 31(9) de la Ley Núm. 10 de 26 de abril de 1994 (20 L.P.R.A. sec. 3054(9)), conocida como la Ley para Reglamentar el Negocio de Bie-nes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico (Ley Núm. 10).
Para resolver este caso tenemos que interpretar el Art. 31(9) de la Ley Núm. 10, supra, para determinar si todos los contratos de corretaje deben tener fecha de venci- *347 miento. Luego de realizar un análisis detenido, resolvemos que todos los tipos de contrato de corretaje deben tener fecha de vencimiento, conforme a la intención legislativa de la Ley Núm. 10. También resolvemos en cuáles circuns-tancias un corredor de bienes raíces tiene el derecho a re-cibir compensación cuando la compraventa se perfeccionó luego de estar vencido el contrato de corretaje.
I — I
En febrero de 1998, el señor Rodríguez Vélez era em-pleado de Masterlite Product, Inc. (Masterlite) y corredor de bienes raíces con licencia. En Masterlite, el señor Rodrí-guez Vélez conoció al Sr. Carlos García Muñiz, accionista de esa entidad y dueño de la entidad comercial Bahía Park. En una reunión, García Muñiz le indicó a Rodríguez Vélez que Bahía Park había adquirido unos terrenos en el área de Cataño y que tenía la intención de venderlos. Al poco tiempo, el señor Rodríguez Vélez cesó en sus funciones en Masterlite y continuó ejerciendo como corredor indepen-diente de bienes raíces.
En marzo de 1998, el señor Rodríguez Vélez se enteró de que Supermercados Amigo necesitaba una finca para relo-calizar sus almacenes generales. Por tal razón, coordinó una reunión con el señor García Muñiz para ver si Bahía Park aún interesaba vender la finca que había adquirido en el municipio de Cataño. El señor Rodríguez Vélez le proveyó información relacionada a lo que había escuchado y le preguntó si interesaba que él realizara algún acerca-miento a Supermercados Amigo con relación a la finca. El señor García Muñiz aceptó y llegó a unos acuerdos preli-minares con el corredor Rodríguez Vélez.
Como resultado de lo anterior el señor Rodríguez Vélez redactó una carta el 17 de marzo de 1998, en la que alega-damente recopiló los acuerdos llegados hasta ese momento. La carta indicaba lo siguiente:
*348 Según conversación que mantuviéramos en las pasadas se-manas en su oficina, le informo que en relación a la posible venta de la finca de 22.37 cuerdas radicada en el Sector Industrial Bahía de Cataño, Puerto Rico, estamos manteniendo ne-gociaciones con el licenciado Luis Colón Martínez, represen-tante de Supermercados Amigo. Hasta el momento estos clientes se han mantenido positivamente interesados en la propiedad.
Aprovecho la oportunidad para confirmar los acuerdos que habíamos tenido anteriormente.
—El precio de venta en terreno utilizable será de sesenta dó-lares ($60.00) por metro cuadrado,
—El precio de venta en terreno no utilizable (wetland) será de diez dólares ($10.00) por metro cuadrado,
—La comisión a ser pagada será de cinco porciento (5.0%) del precio de venta total.
Próximamente estaremos coordinando una reunión en sus oficinas para discutir los detalles de la negociación con amplitud. (Énfasis suprimido.) Apéndice, Exhibit 3, pág. 190.
El señor Rodríguez Vélez coordinó una visita a la ñnca de Cataño para varios representantes de Supermercados Amigo. Estos demostraron tener interés en la propiedad, pero le indicaron que “la determinación final de adquirirla le correspondería a la Junta de Directores de Supermerca-dos Amigo”. Incluso, el corredor expuso en su deposición que “las personas que yo llevé no dependían de ellos para tomar la decisión sino que tenían que ir entonces donde una Junta de Directores que aprobara y ese tipo de cosas”. Apéndice, pág. 313. Posteriormente, el señor Rodríguez Vé-lez realizó varias llamadas de seguimiento, sin éxito, a los representantes del supermercado.
Por otra parte, el entonces abogado de Supermercados Amigo, Ledo. Luis A. Avilés Pagán, quien había fungido de 1995 a 1998 como representante legal de Bahía Park, fue quien se encargó de llevar a la atención de la Junta de Directores de Supermercados Amigo (Junta), el 4 de mayo de 1999, la disponibilidad de los terrenos del señor García Muñiz. El licenciado Avilés Pagán supo de la existencia de *349 los terrenos por el tiempo que colaboró con el señor García Muñiz en Bahía Park.
La Junta estaba evaluando la viabilidad de unos terre-nos en Caguas para establecer un almacén central. Fue entonces cuando el licenciado Avilés Pagán solicitó y ob-tuvo autorización para consultar con el Ledo. Ricardo Mu-ñiz, abogado de Bahía Park y su antiguo compañero de trabajo, si los terrenos de Cataño seguían disponibles. Am-bos representantes legales notificaron al señor García Mu-ñiz el interés de Supermercados Amigo en la finca. Según la parte recurrida, “[flue en virtud de la comunicación ge-nerada entre dichos representantes legales que en junio 1999, Bahía Park y Supermercados Amigo, Inc. suscribie-ron un contrato de opción para la compra de estos terrenos y el 23 de noviembre de 1999, suscribieron la escritura de compraventa de los mismos”. Alegato en oposición a re-curso de apelación, pág. 15. La escritura de compraventa fue por la cantidad de $5,847,925.50.
Así pues, a finales de 2001, el señor Rodríguez Vélez se enteró de que Supermercados Amigo había comprado los terrenos a Bahía Park. El señor Rodríguez Vélez reclamó la comisión de la compraventa al señor García Muñiz, quien le indicó que no le pagaría por no haber sido el pro-motor de la venta final. El 16 de abril de 2002, el señor Rodríguez Vélez presentó ante el Tribunal de Primera Ins-tancia una demanda por incumplimiento de contrato y da-ños y perjuicios contra Bahía Park, el señor García Muñiz, su esposa y la Sociedad Legal de Bienes Gananciales com-puesta por ambos. Solicitó que los demandados pagaran la comisión de la compraventa de los terrenos de Cataño a razón de 5% del precio de venta, equivalente a una suma de $250,000. A esos efectos, alegó que había sido él quien había llevado a los representantes de Supermercados Amigo a ver el terreno por primera vez y que conforme a los acuerdos verbales, ratificados en la carta de 17 de *350 marzo de 1998, tenía derecho a recibir retribución por esa venta. Finalmente solicitó $100,000 por daños.
La parte recurrida contestó la demanda y señaló que: (1) los acuerdos que había hecho con el señor Rodríguez Vélez eran todos preliminares; (2) estipularon una comi-sión de un 4% del precio de venta; (3) ese acuerdo no sería un contrato de servicios con carácter exclusivo, sino de tipo abierto, y (4) vencería a los seis meses. Explicó que, desde marzo de 1998 hasta finales del 2001, el señor Rodríguez Vélez no se había comunicado con él y que entendió que el contrato había expirado catorce meses antes de otorgarse la compraventa.
Como defensa afirmativa, la parte recurrida señaló que el señor Rodríguez Vélez incumplió con el Art. 31(9), de la Ley Núm. 10, supra. Allí se establece que el corredor debe explicar al cliente en qué consiste el acuerdo y exponer cuál es la fecha de su vencimiento. Además, la parte recu-rrida alegó que la carta de 17 de marzo de 1998 no era un contrato, pero que aunque el tribunal entendiera que lo era, no se trababa de un contrato exclusivo, por lo que nada impedía que otro corredor o ella misma intentara vender el bien. También explicó que el alegado contrato carecía de fecha de vencimiento, por lo que conforme a la Ley Núm. 10 era nulo.
Tras varios trámites procesales, el 13 de agosto de 2004 Bahía Park y el señor García Muñiz presentaron una soli-citud de sentencia sumaria. Según ellos, “la parte deman-dante basa su reclamación en una comunicación redactada por el codemandante Giovanni Rodríguez, fechada el 17 de marzo de 1998, en la que pretendió confirmar los términos de un contrato de corretaje con Bahía Park, S.E.”. Aduje-ron que esa comunicación no tenía fecha de vencimiento, por lo que, de ser un contrato de corretaje, éste sería nulo al amparo del Art. 31(9) de la Ley Núm. 10, supra. Atales efectos, manifestaron que ésta fue enmendada por la Ley Núm. 271 de 6 de octubre de 1998 (20 L.P.R.A. see. 3054), *351 para prohibir las cláusulas de renovación automática en todos los contratos de corretaje, con la intención de elimi-nar así la incertidumbre acerca de la extensión de esos contratos. En fin, alegaron que todos los contratos de co-rretaje requieren fecha de vencimiento.
Es oportuno señalar que la solicitud de sentencia suma-ria incluyó, a manera de ilustración, dos contratos redac-tados por el señor Rodríguez Vélez, contemporáneos a las conversaciones con Bahía Park, que contenían fecha de vencimiento y establecían los eventos que condicionaban el pago de la comisión. Por ejemplo, uno de esos contratos mencionaba que si se vendía el terreno luego de seis meses de vencido el contrato a una persona con la que el corredor hubiese negociado, el cliente tenía que pagar la comisión. Nada de lo anterior surgía de la carta de 17 de marzo de 1998. El contrato estimado estaba huérfano de expresiones sobre ese particular y no contemplaba disposición de exten-sión alguna.
Además, los recurridos señalaron que los esfuerzos rea-lizados por el corredor Rodríguez Vélez no fueron suficien-tes para alcanzar la venta. Incluso, éstos aseguraron que sus gestiones se limitaron a una reunión y siete llamadas telefónicas, de las cuales la más larga duró tres minutos, y que casi todas fueron con la secretaria personal del Secre-tario de la Junta de Directores de Supermercados Amigo. La parte recurrida alegó que la labor del señor Rodríguez Vélez no llevó a que la compraventa se realizara y él no fue el promotor de la transacción. Reiteró que la compraventa se completó gracias a los trámites y esfuerzos de los repre-sentantes legales de ambas empresas mucho más de un año después de la intervención del señor Rodríguez Vélez.
El 6 de octubre de 2004, el señor Rodríguez Vélez se opuso a la sentencia sumaria y alegó que el contrato de corretaje era de tipo abierto, lo cual le excluía de la aplica-ción del Art. 31 de la Ley Núm. 10, supra. Explicó que el artículo prohíbe, en el inciso (9), concretar un contrato de *352 corretaje “exclusivo o sem[ie]xclusivo, sin explicar los tér-minos y condiciones del mismo, y su fecha de vencimiento”. Art. 31(9), supra. Explicó que existen diversos tipos de con-tratos de corretaje y que en Puerto Rico se aceptan en la práctica los exclusivos, semiexclusivos y abiertos. También señaló que el legislador quiso que los contratos de corretaje de tipo abierto no tuviesen que tener un término fijo. En último lugar, alegó que no procedía emitir sentencia suma-ria porque existían controversias de hechos importantes por dilucidar, como por ejemplo, el porcentaje de la comi-sión y si el contrato tuvo un término de vencimiento de seis meses. El señor Rodríguez Vélez indicó que, aunque esos elementos ponían en controversia la existencia de un con-trato y sus términos, era indiscutible que él fue el primero que llevó a los representantes de Supermercados Amigo a ver los terrenos, y eso le hacía acreedor de la comisión. El señor Rodríguez Vélez explicó que en los contratos de co-rretajes abiertos se le paga la comisión al primer agente que encuentre un inquilino cualificado. Anexó a la oposi-ción: (1) parte de la deposición del señor García Muñiz, en la que éste habló de un término de seis meses para firmar la escritura de compraventa, y (2) parte de su deposición, en la que aseguró que no concretó una fecha de venci-miento.
La parte recurrida presentó una réplica a la moción en oposición, en la que negó que hubiese una controversia de hechos medulares que impidiera disponer del caso. Indicó que solamente le restaba por resolver si el alegado contrato de corretaje era nulo por carecer de fecha de vencimiento, lo cual era un argumento de Derecho. A esos efectos, ex-puso que el inciso (9) del Artículo 31, supra, se enmendó para incluir “que no serán permitidas las cláusulas de re-novación automática en los contratos de corretaje”. Expuso que como el legislador prohibió las renovaciones automáti-cas en todos los contratos de corretaje, éstos tienen que tener fecha de vencimiento. Además, argumentó que los *353 contratos de tipo abierto no pueden tener una vigencia a perpetuidad, ya que el corredor adquiriría así un derecho a cobrar una comisión de cada persona que interactuó con él con relación a la propiedad, independientemente del tiempo que haya transcurrido y los esfuerzos realizados. A su juicio, eso es irrazonable.
El Tribunal de Primera Instancia emitió una sentencia sumaria en la que acogió los argumentos de Bahía Park y del señor García Muñiz. Entendió que no estaba en contro-versia que las partes realizaron un acuerdo no exclusivo y que la demanda se basaba en la carta de 17 de marzo de 1998, la cual no tenía fecha de vencimiento. El foro prima-rio utilizó la Exposición de Motivos de la Ley Núm. 271 (1998 (Parte 2) Leyes de Puerto Rico 1285) para sustentar que todos los contratos de corretaje, no solamente los ex-clusivos o semiexclusivos, tienen que tener fecha de vencimiento. Concluyó que el contrato de 17 de marzo de 1998 es nulo y el corredor no tiene derecho a cobrar la comisión, por lo que desestimó la demanda.
Inconforme, el peticionario Rodríguez Vélez acudió al Tribunal de Apelaciones y alegó que existía controversia de hechos que impedía disponer del caso mediante el meca-nismo de sentencia sumaria. Explicó que no aplicaba el inciso (9) del Art. 31 de la Ley Núm. 10, supra, ni su en-mienda, ya que allí no se mencionan expresamente los con-tratos de corretaje abiertos. Señaló, además, que estos con-tratos de corretaje se rigen por la figura del mandato, por lo que su extinción queda a la prerrogativa del mandante. Alegó que en los contratos abiertos se le otorga la comisión al primer corredor que consiga a una persona cualificada y que el término de duración está en manos del cliente.
El Tribunal de Apelaciones confirmó la determinación del foro primario. Indicó que únicamente para efectos de emitir la sentencia sumaria, la parte recurrida, Bahía Park, aceptó que la carta de 17 de marzo de 1998 era el contrato de corretaje y que ambas partes estaban de *354 acuerdo en que éste no tenía fecha de vencimiento. El tribunal aclaró que la Ley Núm. 271, supra, no le aplicaba al contrato del caso de autos por ser posterior a la enmienda. Sin embargo, entendió que esa ley debía considerarse por tratarse de la última expresión de la Asamblea Legislativa, la cual buscaba prohibir que todo tipo de contrato de corre-taje tuviera una duración indefinida. El foro intermedio indicó que la exposición de motivos de la enmienda señala que la Ley Núm. 10 le requiere al corredor explicar el con-trato al cliente y su fecha de vencimiento, lo que no ocurrió en este caso. Además, el tribunal razonó que la intención legislativa era incluir todo tipo de contrato de corretaje.
El 7 de junio de 2007, el peticionario Rodríguez Vélez acudió ante nosotros y señaló los mismos errores argumen-tados ante el Tribunal de Apelaciones. Es decir, nos re-quiere que resolvamos si el contrato de corretaje abierto es nulo por no haberse fijado la fecha de vencimiento. Asi-mismo argumenta que no procedía dictar la sentencia su-maria porque existía controversia de hechos sobre el tér-mino del contrato y la comisión a pagar. Además, la parte peticionaria expone que, de aplicar el citado Art. 31(9) al contrato de autos, el hecho de que la parte recurrida ale-gara que tenía fecha vencimiento de seis meses, subsanaba la carencia de término. Sostiene que lo importante es quién enseñó la finca primero a los representantes de Supermer-cados Amigo, independientemente de que el término del contrato de corretaje hubiera expirado.
Expedimos el auto de certiorari el 10 de agosto de 2007. Procedemos a resolver luego de examinar los alegatos de las partes.
II
Como cuestión preliminar debemos determinar si es vá-lido un contrato de corretaje que no tiene fecha de vencimiento.
*355 En este caso, la parte recurrida aceptó para efectos de la solicitud de sentencia sumaria que la carta de 17 de marzo de 1998 fuera considerada como el contrato de corretaje. Por tal razón, la controversia se limitó a resolver si ese contrato es nulo por ser contrario a la Ley Núm. 10 al no contener fecha de vencimiento. La parte peticionaria argu-mentó que la Ley Núm. 10 no aplica al contrato de corre-taje de tipo abierto y que el derecho de los mandatos debía regir la controversia. Debido a la discusión generada sobre el alcance de esa ley, es preciso que nos expresemos sobre este particular.
Como se sabe, el Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14, dispone que “cuando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu”. Según lo anterior, al interpretar un estatuto debemos remitimos inicialmente al texto de la ley cuando el legislador se ha manifestado en un lenguaje claro e inequívoco. Este texto es la expresión por excelencia de toda la intención legislativa. Romero Barceló v. E.L.A., 169 D.P.R. 460, 476, (2007); Irizarry v. J & J Cons. Prods. Co., Inc., 150 D.P.R. 155 (2000). Conforme a lo anterior, si una ley es clara y no produce ambigüedad, no hay necesidad de buscar más allá de su letra. Departamento de Hacienda v. Telefónica, 164 D.P.R. 195 (2005).
Ahora bien, cuando el estatuto es confuso, es deber del Tribunal llenar las lagunas que hubiese y armonizar aquellas disposiciones que estén o parezcan estar en conflicto. P.P.D. v. Gobernador, 111 D.P.R. 8, 13 (1981). Cónsono con ello, el Art. 17 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 17, establece que cuando las palabras de una ley son dudosas, su sentido debe ser buscado por el examen y la comparación de las frases dudosas con otras palabras y sentencias que les estén relacionadas, en el or-den de una buena investigación para llegar a su verdadero significado. El ejercicio de la interpretación estatutaria re- *356 quiere que indaguemos la intención legislativa a través del análisis del historial legislativo de la ley, su exposición de motivos, de los diversos informes de las comisiones de las cámaras o de los debates celebrados en el hemiciclo. Ortiz v. Municipio San Juan, 167 D.P.R. 609, 617 (2006); Vicenti v. Saldaña, 157 D.P.R. 37 (2002).
Asimismo, el Art. 19 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 19, expone que el medio más eficaz y universal para descubrir el verdadero sentido de una ley en caso de duda es “ ‘considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla’ ”. Col. Int’l Sek P.R., Inc. v. Escribá, 135 D.P.R. 647, 661 (1994). En Zambrana Maldonado v. E.L.A., 129 D.P.R. 740, 749 (1992), expresamos que “el análisis de la ley debe hacerse teniendo en mente los fines que ésta persigue y de forma tal que la ley se ajuste a la política pública que la inspira”. También indicamos que, en el proceso de interpretación, no debemos desvincular la ley del problema que intenta solucionar. Id. Tenemos el “deber de hacer que el derecho sirva propósitos útiles y evitar una interpretación tan literal que lleva a resultados absurdos”. Pacheco v. Vargas, Alcaide, 120 D.P.R. 404, 409 (1988). En fin, la ley se debe interpretar de la forma que más se ajuste a la intención de la Asamblea Legislativa. Asoc. Médica de P.R. v. Cruz Azul, 118 D.P.R. 669, 676 (1987); Col. Int’l Sek P.R., Inc. v. Escribá, supra.
Por último, debido a que las leyes y reglas no pueden prever todas las situaciones, es lógico que la jurisprudencia llene las lagunas del derecho positivo. Ello no debe caer en la libre legislación casuística. Rivera Rivera v. Comisión Industrial, 103 D.P.R. 51, 58 esc. 3 (1974). A la luz de las reglas de hermenéutica legal esbozadas, pasamos a resolver la controversia en cuestión.
Conforme a la práctica de las bienes raíces hay tres tipos de contratos de corretaje, a saber: los exclusivos, *357 los semiexclusivos y los abiertos. Véase D. Barlow Burke, Jr., Law of Real State Brokers, 3ra ed., Nueva York, Aspen Pubs., 2009, Sec. 2.02[A-C], págs. 2.24-2.49. El contrato de corretaje exclusivo es aquel mediante el cual el cliente “le concede al corredor o empresa de bienes raíces la autoriza-ción única y exclusiva para actuar como intermediario en representación de éste para ofrecer, promocionar y nego-ciar determinada transacción de bienes raíces. Este tipo de contrato limita la competencia y participación de otros co-rredores o empresas de bienes raíces en la gestión de co-rretaje, así como la capacidad del propietario de perfeccio-nar por sí mismo la transacción de bienes raíces”. R. Cintrón Perales, El contrato de corretaje de bienes raíces y opción de compraventa de propiedades residenciales, San Juan, Ed. Situm, 2006, págs. 85-86. En el contrato semiex-clusivo, contrario al exclusivo, el dueño “no renuncia a su facultad de realizar gestiones para perfeccionar la transac-ción de bienes raíces por sí mismo”. Cintrón Perales, op. cit., pág. 87.
Finalmente, en los contratos de corretaje abiertos, como el que nos ocupa, el cliente “se reserva la facultad de contratar el número de corredores que desee. El derecho de exigir el pago de la comisión será de aquel corredor que haya sido quien procuró que se perfeccionara la transacción de bienes raíces (procuring cause)”. Cintrón Perales, op. cit., págs. 88-89. Cuando el contrato de corretaje no establece el tipo, se presumirá abierto. Barlow Burke, op. cit., Sec. 2.02, pág. 2.25. Este tipo de contrato de corretaje es el más informal. Se conoce por no ser de carácter exclusivo. De ordinario, lo utilizan los vendedores que intentan vender por su cuenta su propiedad, pero que están dispuestos a darle la oportunidad a un corredor a que intente venderla primero. Generalmente el corredor acuerda que será acreedor de la comisión al perfeccionarse la venta. Barlow Burke, op. cit., págs. 2.24-2.25.
La Ley Núm. 10 no contempla ni define esos tres *358 tipos de contratos de corretaje. Sin embargo, dispone en el Art. 31(9) que está prohibido por un corredor de bienes raí-ces “[r]ealizar con cualquier parte un contrato de corretaje exclusivo o semi exclusivo [sic], sin explicarle los términos y condiciones del mismo, y su fecha de vencimiento', Dispo-niéndose, que no serán permitidas las cláusulas de renova-ción automáticas en los contratos de corretaje”. (Enfasis suplido.) Originalmente y a la fecha de la suscripción del contrato de autos, la Ley Núm. 10 solamente mencionaba que se prohibía a toda persona sujeta a las disposiciones de la ley “[r]ealizar con cualquier parte un contrato de corretaje exclusivo o sem[ie]xclusivo, sin explicarle los términos y condiciones del mismo y su fecha de vencimiento”. Art. 31(9), 20 L.P.R.A. sec. 3054(9) (ed. 1998).
Es debido a la utilización de los términos exclusivo o semiexclusivo en el Art. 31(9), supra, que la parte peticio-naria sostiene que la Asamblea Legislativa estaba utili-zando la terminología técnica de la profesión y excluyendo implícitamente los contratos de corretaje de tipo abierto. Por otra parte, los recurridos alegan que, a base de ese artículo y el propósito de la ley, todos los contratos de co-rretaje deben tener una fecha de vencimiento o serán nulos. Entienden que el texto citado no tuvo la intención específica de omitir algún tipo de contrato de corretaje y que establece una obligación general. Incluso, no define los tipos de contrato de corretaje. Por consiguiente, una de las controversias que nos ocupan es si el Art. 31(9) de la Ley Núm. 10, supra, exige que todos los contratos de corretaje tengan una fecha de vencimiento, o si el contrato de corre-taje abierto está excluido.
La polémica se acentúa al considerar que, luego de sus-crito el acuerdo entre las partes, el legislador enmendó el Art. 31(9) de la Ley Núm. 10, supra, a fin de prohibir las cláusulas de renovación automática en todos los contratos de corretaje. A tales efectos, incluyó el lenguaje siguiente: “Disponiéndose, que no serán permitidas las cláusulas de *359 renovación automáticas en los contratos de corretaje.” (Én-fasis suplido.) Los recurridos aseveran que en la exposición de motivos de esa enmienda, la Asamblea Legislativa im-plica que la Ley Núm. 10 ya exigía que todos los contratos de corretaje tuvieran un término o una fecha de vencimiento. Es lógico que al prohibir la renovación auto-mática de todos los contratos de corretaje, se implica que todos tienen que tener una fecha de vencimiento. Ello, sin duda, incluiría a los contratos de corretaje de tipo abierto.
Francamente, el lenguaje del Art. 31(9), supra, es con-fuso, ya que no deja claro si el legislador quería prohibir que los corredores de bienes raíces contrataran sin explicar los términos del contrato, incluyendo la fecha de venci-miento o si su interés era que, tales contratos siempre tu-vieran fecha de vencimiento. Pese a que el lenguaje parece sencillo, no queda claro cuál era el interés o la prohibición que la Asamblea Legislativa procuró al redactar la ley. Cabe señalar que nunca antes hemos interpretado este ar-tículo aunque requiere aclaración.
La Asamblea Legislativa aprobó la Ley Núm. 10 con la intención de agrupar todas las disposiciones legales que estaban en vigor, en aquel momento, para la industria de las bienes raíces. Con su aprobación se derogaron: la Ley Núm. 139 de 14 de junio de 1980, conocida como la Ley para Reglamentar la Profesión de Corredor de Bienes Raí-ces en Puerto Rico (Ley Núm. 139) 1980 Leyes de Puerto Rico 544; la Ley Núm. 145 de 18 de junio de 1980, conocida como la Ley para Reglamentar la Venta en la Isla de Bie-nes de Raíces Localizados fuera de Puerto Rico (Ley Núm. 145), 1980 Leyes de Puerto Rico 589, y los Reglamentos sobre Competencia Justa Números IV y V de la Oficina de Asuntos Monopolísticos del Departamento de Justicia.
Del Diario de Sesiones de la Cámara de Representantes emana que fueron recogidas en la Ley Núm. 10 algunas prácticas proscritas por los corredores y contenidas en la Ley Núm. 145. Allí, el Hon. Ángel Cintrón García explicó *360 que incluyó la Ley Núm. 145, “y se recoge gran parte de esa ley, y se coloca aquí como prácticas proscritas, y se es bien específico, y se defiende cabalmente al consumidor puertorriqueño”. (Énfasis suplido.) Diario de Sesiones de la Cámara de Representantes de Puerto Rico, Debate sobre el P. del S. 300 de 11 de abril de 1994, Tercera Sesión Ordi-naria, Duodécima Asamblea Legislativa, pág. 172.
Asimismo, el representante Cintrón García indicó:
De las leyes que se derogan, una, que es de la autoría de Misla Aldarondo del año '80, y una de la autoría del señor Navarro Alicea, del año '80, ambos aquí presentes —quiere decir que es legislador hace mucho tiempo— están ambas englobadas prác-ticamente casi ad verbatim en esta nueva ley, por eso es que hay más de ocho páginas de la ley que era del compañero Navarro Alicea [entiéndase, la Ley Núm. 145], porque lo que se hace es consolidar el ejercicio en un[a] sola ley, y se recogió todo lo que estaba disperso en años anteriores para que los compañeros tengan la tranquilidad de que la intención legis-lativa y la efectividad que han tenido por año[s] esas dos leyes, la 139 y 145, de ninguna manera se afecta ni se pierde, sino que se consolida en un solo ejercicio. (Énfasis suplido.) Debate sobre el P. del S. 300, supra, pág. 177.
Puesto que una gran parte del contenido de la Ley Núm. 145 fue incluido en la Ley Núm. 10 como prácticas proscri-tas, es decir, como parte del Art. 31, supra, entendemos pertinente evaluar el contenido del estatuto derogado. La Ley Núm. 145 buscaba regular la proliferación de corredo-res o instituciones de bienes raíces que realizaban contra-tos de corretaje y venta en Puerto Rico sobre terrenos en el estado de la Florida. Esa ley contenía un amplio número de restricciones dirigidas a que el cliente del corredor de bie-nes raíces estuviera bien informado y supiera específica-mente el alcance del contrato que estaba firmando. Ade-más, se buscaba que el cliente conociera con certeza qué era lo que estaba comprando.
El Art. 8(Z)(3) de la Ley Núm. 145 (1980 Leyes de Puerto Rico 596) prohibía en la actividad de una oferta de venta o *361 venta en Puerto Rico de bienes inmuebles fuera de la isla un contrato de venta sin detallar “el término de duración de dicho contrato, incluyendo específicamente la fecha de vencimiento”. (Énfasis suplido.) Ese es el único lenguaje dirigido a establecer un interés particular del legislador en que el cliente conozca el término de vigencia del contrato.
Ahora bien, la Ley Núm. 145 no es el único estatuto incorporado al contenido de la Ley Núm. 10, que enfatiza los deberes del corredor de bienes raíces y la necesidad de mantener informado al cliente de los términos del contrato. La Exposición de Motivos de la Ley Núm. 139 (1980 Leyes de Puerto Rico 545), mencionaba que es “necesario que se provean unos mecanismos que le garanticen al pueblo un servicio competente y confiable”. Asimismo, el Reglamento V sobre Competencia Justa (Regulando en Puerto Rico el Negocio de Bienes Raíces Localizados en Puerto Rico), Re-glamento Núm. 1639, Departamento de Estado, 8 de fe-brero de 1973, establecía actos y prácticas proscritas a ven-dedores y corredores en general con el ánimo de proteger al consumidor. Hemos notado que del Reglamento V es que surge la mayor parte del contenido del Art. 31 de la Ley Núm. 10, supra, ya que algunos incisos son prácticamente similares.
El Art. V(A)(23) del Reglamento V, supra, pág. 13, pro-hibía “concertar con cualquier cliente un contrato autori-zando al corredor o vendedor actué como el agente exclu-sivo en la venta de dicha propiedad sin antes informar al cliente sobre los alcances de esta exclusividad”. (Énfasis suplido.) Éste es el único lenguaje en ese reglamento rela-cionado al deber del agente en caso de realizar acuerdos con exclusividad y la función de mantener informado al cliente. El inciso (9) del Art. 31 de la Ley Núm. 10, supra, parece ser el producto de la unión del contenido del Art. 8(Z)(3) de la Ley Núm. 145, supra, y las expresiones del Art. V(2)3 del Reglamento V sobre Competencia Justa, supra.
*362 Consideramos que las leyes agrupadas y derogadas por la Ley Núm. 10 hacen énfasis en que los clientes tengan conocimiento del alcance y el término del contrato. La Ley Núm. 10 no hace distinción entre tipos de contrato de corretaje. Sin duda, es un factor común de todas las leyes que cobijaban esta materia la intención de proteger al con-sumidor de prácticas deshonestas de los corredores de bie-nes raíces e instituciones que se dedican a esos fines. De hecho, esa fue la política pública que se reconoció en la Ley Núm. 10.
Esa ley establece un ordenamiento especial para regla-mentar el negocio de bienes raíces relacionado a propieda-des en y fuera de Puerto Rico. Todo ello, se debe a la natu-raleza de las funciones del corredor de bienes raíces y la importancia que tiene éste en la compra y venta de inmuebles. Exposición de Motivos de la Ley Núm. 10 (1994 Leyes de Puerto Rico 43-44). Con el objetivo de proteger a los consumidores, la Ley Núm. 10 dispuso un nuevo y más estricto cuerpo reglamentario de los vendedores, corredo-res o empresas de bienes raíces. Id.; Vélez v. Izquierdo, 162 D.P.R. 88, 95 (2004).
Durante el debate de la Cámara de Representantes para la aprobación de la Ley Núm. 10 se recalcó la natura-leza delicada de los intereses de los consumidores. En particular, se mencionó que no era un asunto sencillo regla-mentar una profesión que maneja las transacciones de bienes inmuebles que “probablemente en las familias puer-torriqueñas, son el único activo que tienen nuestras fami-lias, especialmente las de clase media y clase humilde”. Debate sobre el P. del S. 300, supra, págs. 169-170. Ade-más, se enfatizó en que algunas de las leyes que quedarían derogadas, como la Ley Núm. 145, atendían situaciones que habían afectado a muchos consumidores puertorrique-ños y que ese aspecto debía mantenerse en la nueva ley. Con ello, se otorgaron los ejemplos de corredores que ven- *363 dían terrenos de la Florida en Puerto Rico de manera frau-dulenta y la venta de viviendas con amplios defectos de construcción conocidas por los desarrolladores. Más aún, se habló de casos de personas que no se dedican a la indus-tria, pero que servían como corredores, engañando a los consumidores. Id., págs. 173-175.
Debido a la importancia de esta legislación, su texto fue examinado en varias ocasiones antes de su aprobación. En la primera versión del P. del S. 300 de 30 de abril de 1993, el Art. 31(21) de actos y prácticas proscritas, pág. 25, esta-blecía que quedaba prohibido al corredor “[c]oncertar con cualquier cliente un contrato de corretaje exclusivo o sem[ie]xclusivo, sin explicarle sobre el alcance de esta ex-clusividad o sem[ie]xclusividad o no indicar en dicho con-trato la fecha de expiración del mismo”. Como se puede apreciar, ese inciso es muy similar a lo que establecía el Reglamento V y la Ley Núm. 145. No fue hasta la segunda sesión ordinaria de 1993 que se concretó el lenguaje del Art. 31, supra, con el que se aprobó la ley. De lo anterior surge que la Ley Núm. 10 y sus antecesoras fueron concer-tadas con la intención de proteger al consumidor y fomen-tar que éste estuviera bien informado al comprometerse contractualmente con el corredor. Ello se desprende de casi todo el debate del P. del S. 300.
Cónsono con el sentir de proteger al consumidor, la Asamblea Legislativa enmendó el citado Art. 31(9) de la Ley Núm. 10 mediante la Ley Núm. 271. En lo pertinente, la Exposición de Motivos de la Ley Núm. 271 (1998 Leyes de Puerto Rico 1285-1286) señala:
La Ley Núm. 10 de 26 de abril de 1994 tuvo el propósito, entre otros, de reglamentar el negocio de Bienes Raíces ... resultando en beneficio de los consumidores, así como también los Vendedores, Corredores y Empresas de Bienes Raíces. Ac-tualmente uno de los aspectos más importantes en una nego-ciación de bienes raíces es la relación contractual que se esta-blece con el cliente. Estas negociaciones se formalizan *364 comúnmente mediante “contratos de corretaje” que deben de disponer de un término fijo de tiempo donde un corredor tiene los derechos para la venta de una propiedad. Algunos corredo-res o vendedores de bienes raíces utilizan en sus contratos de corretaje las llamadas “cláusulas automáticas de renovación” que tienen como fin prorrogar automáticamente, bajo los tér-minos originales, el contrato de corretaje.
Esta cláusula podría resultar engañosa, pues el cliente casi siempre está consciente del término inicial del contrato que regularmente dura tres, cuatro o seis meses, pero en raras oca-siones se percata de la extensión automática del mismo, resul-tando en una extensión sustancial del contrato original. Ac-tualmente la Ley dispone que todo contrato que se acuerde y firme entre los clientes y los corredores, debe estar claro y bien explicado. Debe existir la seguridad y confianza entre las par-tes a la hora de realizar un contrato de corretaje, aunque, la-mentablemente la situación antes expresada es motivo de pre-ocupación entre gran parte del sector dedicado a las bienes raíces así como también entre la ciudadanía interesada en es-tos importantes servicios.
Esta Asamblea Legislativa entiende meritorio el que no se permitan las cláusulas de renovación automáticas en los con-tratos de corretaje entre los corredores de bienes raíces y sus clientes. (Enfasis suplido.)
Como vemos, el lenguaje utilizado se dirige nuevamente a proteger al consumidor al momento de contratar con un corredor. Cabe señalar que la exposición de motivos da por hecho que los contratos de corretaje, en un sentido general, tendrán que tener fecha de vencimiento. Allí, el legislador no hizo distinción alguna entre tipos de contratos de corretaje. El sentir de la Asamblea Legislativa se enfoca en que los términos de los contratos queden claros a las partes. Aparentemente los términos “exclusivo” o “semiex-clusivos” no se refieren necesariamente a tipos de contrato de corretaje, sino más bien a medios o formas de hacer la negociación con el corredor.
La enmienda dice claramente que las cláusulas de reno-vación automática no serán permitidas “en los contratos de corretaje”. No lo limita y se refiere a todos, lo cual incluye los abiertos. Por lo tanto, una renovación supone que los contratos de corretaje tienen que tener fecha de venci- *365 miento. Concluir lo contrario sería legislar judicialmente para establecer que la enmienda de 1998 debe aplicar so-lamente a los contratos de corretaje exclusivos o semiexclusivos. Una lectura integrada del texto del artí-culo, incluyendo la enmienda, aclara el sentir del legislador. Nada impide que tomemos en consideración, para efectos interpretativos, la exposición de motivos de una ley enmendadora. Con ello no desvirtuamos su conte-nido, sino que interpretamos la ley como un todo y le da-mos sentido lógico a las palabras del legislador.
De acuerdo con lo anterior, la Ley Núm. 10 no dispone expresamente que los contratos de corretaje de tipo abierto sean nulos por no contener fecha de vencimiento. No obs-tante, de un análisis del trasfondo de la intención legisla-tiva para promulgar la ley, la enmienda contenida en la Ley Núm. 271 y la Exposición de Motivos, se puede deducir que la Asamblea Legislativa quiso que todo contrato de corretaje tuviera una fecha de vencimiento o un término de duración. Tanto es así que, al enmendar la Ley Núm. 10, la Asamblea Legislativa se enfocó en que ese término de du-ración, cuya existencia no cuestionaba, no debía ser reno-vado automáticamente. Al disponer que los contratos de corretaje no deban permitir las cláusulas de renovación au-tomática, el legislador supuso que todo contrato de corre-taje tiene una fecha de vencimiento, independientemente del tipo de contrato de corretaje que sea, a saber, exclusivo, semiexclusivo o abierto.
El profesor de bienes raíces, Rafael A. Cintrón Perales, discutió en su obra las prácticas proscritas de la Ley Núm. 10 en los Arts. 31 y 32, supra. Sobre este particular indica:
Los artículos 31 y 32 de la Ley Núm. 10, antes citada, esta-blecen los actos y prácticas proscritas para la profesión de co-rredor, vendedor y empresas de bienes raíces. Es precisamente a estos actos o prácticas proscritas que debemos acudir para establecer las obligaciones del Corredor de Bienes Raíces para con sus clientes. Si analizamos los mismos, debemos concluir *366 que todo corredor, vendedor o empresa de bienes raíces viene obligado a:
8. Explicarle a su cliente todos los términos y condiciones, así como la fecha de vencimiento al momento de realizar un contrato de corretaje exclusivo, semi-exclusivo [sic] o abierto. (Énfasis suplido.) Cintrón Perales, op. cit., págs. 17-18.
No dudamos, tal y como señalaron el Tribunal de Primera Instancia y el Tribunal de Apelaciones, que la intención legislativa al aprobar el Art. 10(9) de la Ley Núm. 10, supra, reafirmada en la Exposición de Motivos de la Ley Núm. 271, supra, fue que todos los contratos de corretaje lleven una fecha de vencimiento y que ésta sea explicada al cliente. En ese sentido, es razonable concluir que todo contrato de corretaje que no contenga una fecha de vencimiento es contrario a la ley y por ello, será nulo.
Un contrato de corretaje sin término de vencimiento es contrario a la Ley Núm. 10. Como se sabe, las partes son libres para contratar lo que entienden necesario, siempre y cuando no sea contrario a la ley, la moral y el orden público. Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3372. La violación de este principio podría producir la nulidad absoluta de lo pactado. Unisys v. Ramallo Brothers, 128 D.P.R. 842, 851 (1991).
En fin, podemos colegir, mediante el análisis de las le-yes especiales y los reglamentos anteriores sobre esta ma-teria, que pese al lenguaje utilizado en el Art. 31(9), supra, siempre ha sido la intención legislativa que los corredores de bienes raíces le expliquen a sus clientes los términos del contrato, el alcance de la exclusividad o la falta de ésta y la fecha de vencimiento. A base de lo anterior, es forzoso con-cluir que la intención legislativa de la Ley Núm. 10 fue que todos los contratos de corretaje tuvieran fecha de vencimiento. Por lo tanto, son contrarios a la ley los con-tratos que no la contengan. Eso los hace nulos.
*367 III
Nos resta por resolver si el derecho de un corredor de bienes raíces a recibir la comisión se desvanece cuando la compraventa se perfecciona, luego de vencido el contrato de corretaje. No existe una norma clara sobre esta interrogante. La controversia de derecho es crucial en este caso, ya que si se resuelve que el contrato tenía un término de vigencia de seis meses, ya habría vencido cuando se perfeccionó la venta. Tomando en consideración que la Ley Núm. 10 prohíbe específicamente la renovación automática de los términos de los contratos de corretaje, restaría deci-dir entonces qué derechos, si alguno, le asisten al corredor.
Como cuestión preliminar, debemos discutir cuándo un corredor de bienes raíces tiene el derecho a una comisión en un contrato de corretaje. La norma aceptada por este Tribunal y la mayoría de los estados sobre el derecho a recibir comisión es la doctrina de “ready, willing and able”. Véase Taylor v. Weingart, 693 P.2d. 1231, 1233 (Mont. 1984). Esta doctrina es utilizada cuando no queda claro en el contrato en cuáles circunstancias el corredor tiene dere-cho a recibir la comisión.
Este Tribunal acogió la doctrina de “ready, willing and able” en el caso Torres v. Arbona, Jr., 72 D.P.R. 769 (1951).(1) En aquella ocasión apuntamos que, en casos en los que existe un conflicto en el perfeccionamiento *368 de la compraventa, el corredor que procuró un comprador dispuesto, deseoso y en condiciones económicas para com-prar (“ready, willing and able”), según los términos estable-cidos por el vendedor, tiene el derecho a recibir la comisión pactada. íd., pág. 778. Asimismo indicamos que, cuando se pacta que la comisión queda supeditada a la consumación del contrato, el corredor tendrá el derecho a la comisión si la compraventa no se consumó debido a fraude, culpa o mala fe del vendedor. Id.
En Col. Int’l Sek P. R., Inc. v. Escribá, supra, volvimos a hacer referencia a esa doctrina. En ese caso, reiteramos que el corredor tiene derecho a la comisión desde el momento cuando se perfecciona el contrato. Igualmente, tiene el derecho a la comisión si, por causas imputables a los contratantes, el negocio no llega a consumarse. Tal será el caso de fraude, la culpa o mala fe del vendedor para que el contrato de venta no se realice. Id., pág. 657. Con ello se protege al corredor ante el caso de que al vendedor ya no le interese o sencillamente se arrepienta de vender.
Como norma general, entonces, cuando un contrato no disponga cómo y por qué se otorgará la compensación, el corredor tendrá el derecho a recibir la comisión si procura un prospecto listo, dispuesto y capaz de comprar (“ready, willing and able”). Ese prospecto debe querer entrar voluntariamente en un contrato vinculante de compraventa sobre la propiedad disponible y realizar una oferta. Además, no necesita mayor convencimiento para comprar y debe permanecer tiempo suficiente en ese estado mental para que se realice una negociación dirigida a que se acepte su oferta. Una oferta por escrito es prueba prima facie de ese estado mental. Barlow Burke, op. cit., Sec. 5.02[A], pág. 5.27.
Ahora bien, en ocasiones, a pesar de haberse perfeccio-nado la transacción de bienes raíces, surge otro tipo de controversia entre el cliente y el corredor. Tal es el caso, *369 como en el presente, en que el vendedor entiende que el tercero no llegó a perfeccionar el negocio a través de los esfuerzos del corredor. En ese tipo de situaciones, la doc-trina mayoritaria reconocida para establecer si un corredor es acreedor de la comisión, es la doctrina de causa eficiente que hizo que se perfeccionara la transacción (efficient procuring cause). Esta doctrina ha sido acogida por la mayoría de las jurisdicciones estadounidenses y va de la mano del comprador listo, deseoso y en condiciones económicas para comprar (“ready, willing and able”). Véase L. Zeigler, Brokers and Their Commissions, 14 Real Est. L.J. 122, 123 (1985). En el caso de los contratos de corretaje abierto, es-pecialmente en casos en los que existe más de un corredor tratando de vender el bien, esta norma es altamente deter-minante y generalmente utilizada por los tribunales estatales.
Puerto Rico tiene un sistema legal mixto. J. Trías Monge, The Structure of the American Legal System-Its Sources, Forms and Theory of Law, 51 Rev. Jur. U.P.R. 11, 16 (1982). Este híbrido es el resultado exitoso de la interacción centenaria de principios legales, casuística, leyes y códigos provenientes tanto del derecho civil español como del derecho consuetudinario (common law) estadounidense. Para una discusión detallada e ilustrativa al respecto, véase Matos Rivera v. Flav-O-Rich, 876 F.Supp. 573 (D. P.R. 1995). Por eso “no hemos dudado en anteriores ocasiones, adoptar doctrinas y normas de interpretación del common law cuando las hemos considerado acertadas y enriquecedoras de nuestro Derecho”. Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 169 (1994). Lo crucial es que lo hagamos con la reflexión y corrección debida, para que no desnaturalicemos los principios de derecho civilistas y del derecho consuetudinario que constituyen parte fundamental de nuestro ordenamiento legal autóctono y que, en conjunto, en sus ámbitos respectivos, conforman el derecho puertorriqueño contemporáneo.
*370 Cónsono con esta visión, adoptamos hoy la norma esta-dounidense de la causa eficiente que procuró que se perfec-cionara la transacción (procuring cause). Esa norma es cónsona con el estado de nuestro Derecho puertorriqueño y con nuestra realidad económica.
La doctrina de la causa eficiente que procuró qué se perfeccionara la transacción (procuring cause) no se enfoca en las cualificaciones de la persona interesada que consiguió el corredor, sino en la cadena de eventos que, de otra forma, llevarían al corredor a recibir la comisión. Por ejemplo, lo esencial será el perfeccionamiento del contrato de compraventa, el cierre hipotecario o cualquier otra condición que se estableciera en el contrato para que el corredor recibiera la comisión. Barlow Burke, op. cit., págs. 5.51—5.52. Véase Dale Denton Real Estate, Inc. v. Fitzgerald, 635 A.2d 925, 928 (1993). En ese sentido, se entiende que un corredor procuró una venta si ésta se perfeccionó a través de sus esfuerzos, mediante la utilización de promociones, mercadeo, rótulos, anuncios y negociaciones, entre otras.
El término procurar, en esta doctrina, es el inicio de una serie de eventos consecutivos que llevan a la perfección de la transacción de bienes raíces o al cumplimiento de su encomienda como intermediario. Mientras más corta sea la cadena de eventos que llevaron al perfeccionamiento del contrato, más favorable será para el corredor recibir la compensación pactada. Además, si hubo una ruptura en la cadena de eventos pertinentes, se debe concluir que la gestión del corredor no fue la causa que procuró la negociación. Barlow Burke, op. cit., Sec. 5.04, pág. 5.53. Véase B-H, Inc. v. Industrial America, Inc., 253 A.2d 209, 214 (1969).
Un corredor de bienes raíces no tiene el derecho a recobrar comisión cuando sus esfuerzos solamente produjeron un evento en la cadena de acciones que contribuyó a *371 la venta de la propiedad. Barlow Burke, op cit., Sec. 5.04, pág. 5.56. Véase ERA Joseph Green Real Estate, Inc. v. Daubert, 588 N.Y.S.2d 922 (N.Y. App. Div. 1992). Por ejem-plo, en Arkansas se ha reconocido que un corredor no tiene el derecho a recobrar la comisión cuando solamente realizó un evento en la cadena de acción. El corredor debe ser la causa próxima de la venta y no un mero eslabón incidental. Además, la venta debe ser el resultado del curso continuo de los eventos. Hatchett v. Story, 221 Ark. 120, 252 S.W.2d 78 (1952). No es suficiente que el corredor sea el primero en poner a las partes en contacto. Si las partes abandonan las negociaciones y otro corredor eventualmente vende la propiedad, será el último el que adquiere el derecho a re-cibir la comisión. Mix v. Broyles, 567 S.W. 2d 696 (1978). No obstante, el corredor tiene el derecho a recibir la comi-sión cuando es excluido de la venta final, si demuestra su participación activa en la cadena de eventos y no es un suceso aislado. Véanse: Barrett v. Land Mart of America, Inc., 3 Ark. App. 70, 621 S.W.2d 889 (1981); Storey v. Johnson, 270 Ark. 392, 605 S.W.2d 480 (1980).
Por regla general y conforme a lo expresado, en los contratos de corretaje de tipo abierto, “el primer corredor que produzca un cliente listo, dispuesto y capaz económicamente y que concrete la transacción con el dueño de la propiedad es el que tendrá derecho al pago de la comisión”. Cintrón Perales, op. cit., págs. 88-89. Un comprador listo, dispuesto y capaz, es aquel que celebre la transacción según los términos del vendedor. Barlow Burke, op. cit., Sec. 2.02, pág. 2.25.
En los contratos de tipo abierto, el hecho de que uno de los corredores que tenga a su cargo la propiedad introduzca un prospecto al cliente, no impide que otro corredor sea el que procuró (procuring cause), o sea quien produjo la compraventa, y por ende, quien tiene el derecho a la comisión pactada. Barlow Burke, op. cit., págs. 2.25- *372 2.26. Véase, además, Staubus v. Reid, 652 S.W.2d. 293 (1983). Es decir, la comisión la recibirá el corredor que per-suadió e indujo al tercero a convenir el arreglo financiero. Además, en los contratos de corretaje de tipo abierto, “el dueño mantiene el derecho de realizar gestiones por sí mismo para vender la propiedad”. Cintrón Perales, op. cit., pág. 89.
Como se puede apreciar, la doctrina de la causa que produjo la transacción (procuring cause) depende de los hechos de cada caso. Algunas jurisdicciones insisten en que es muy oneroso que el corredor pueda encontrar una persona lista, dispuesta y capaz durante el término del contrato. Por esa razón, utilizan la doctrina en casos en los que los contratos de corretaje ya expiraron, pero todavía quedaban negociaciones pendientes con algunos prospectos en un tiempo relativamente cercano a la expiración del contrato. Barlow Burke, op. cit., Sec. 5.04, págs. 5.51 y 5.70. Véase Paine/Wetzel Assoc., Inc. v. Dockside Dev. Corp., 529 N.E. 2d 588, 589 (1988).
Evidentemente, la expiración del plazo pactado conlleva la extinción del contrato de corretaje. El término de una obligación es de vital importancia, ya que define a las partes la cantidad de tiempo en la que quedan obligadas. En los contratos de corretaje el corredor se compromete a la realización de los esfuerzos y gestiones para conseguir un comprador que esté dispuesto y en condiciones de llevar a cabo la compraventa en un período de tiempo específico. Ello es la razón que obliga al vendedor a cumplir con su promesa de pago, o sea, la comisión.
Ahora bien, debemos determinar qué ocurre si se produce una oferta del comprador con el prospecto que inicialmente hizo gestiones, luego de la expiración del contrato de corretaje. El corredor ya no tendría derecho conforme al contrato. Sin embargo, el corredor tiene el derecho a reclamar una compensación debido a que el vendedor recibió un beneficio de sus esfuerzos. Esa compensación no *373 es por incumplimiento de contrato, sino en virtud de la doctrina de la causa que produjo la compraventa (procuring cause) y será una acción de quantum meruit. Véanse: Amend v. 485 Properties, 627 S.E.2d 565 (2006); Allen v. TA Communications, Inc., 181 Ga. App. 726, 727 (353 S.E.2d 569 (1987).
Generalmente este tipo de conflicto se resuelve en la práctica con la incorporación de una cláusula de extensión en los contratos de corretaje. De hecho, el profesor Cintrón Perales llama la atención a que el corredor de bienes raíces debe tener presente que, conforme a la Ley Núm. 10, las cláusulas de renovación automática están vedadas, por lo que algunos corredores establecen, como medida de pre-caución, unas cláusulas de extensión que les permiten co-brar al corredor aun pasado el término del contrato. Ellas son distintas a las cláusulas de renovación automática. So-bre este particular, Cintrón Perales indica:
... [E]n la práctica de la profesión comúnmente se utiliza una cláusula donde el corredor informa al cliente sobre su obligación de pagar la comisión si luego de vencido el contrato y dentro de cierto término, este le vende a un comprador que llegó a la transacción, por conducto y los esfuerzos del corredor. Esta cláusula es conocida como una cláusula de ex-tensión la cual sirve para proteger al corredor del vendedor que espera hasta que finalice el término del contrato de corre-taje para luego realizar la transacción con algún prospecto comprador que fue llevado a la propiedad por el corredor. (Én-fasis suplido y en el original.) Cintrón Perales, op. cit., pág. 61.
Expone, además, que usualmente en las cláusulas de extensión en contratos de transacciones residenciales, como uso y costumbre, el término de esos contratos es de seis meses. Cintrón Perales, op. cit., pág. 60. Recomienda que, para que tales cláusulas sean efectivas, el corredor notifique por escrito las personas a las que ha mostrado la propiedad, así como la hora y fecha de la gestión. íd., pág. 61. Finalmente, expone que tales cláusulas no son una re-novación automática del contrato, por lo que no están ve-dadas por la Ley Núm. 10.
*374 Como vemos, el tratadista nos explica que existen unas cláusulas de extensión diseñadas para proteger la gestión del corredor. Con ellas se persigue garantizar que, en caso de que el término del contrato esté por vencer y las partes se encuentren en espera de un tercero para perfeccionar la compraventa, el corredor pueda cobrar su comisión si se completa el negocio jurídico con posterioridad. Como regla general, una vez vencido el término del contrato, la obligación termina y el contrato se extingue. Es solamente mediante un pacto en contrario y por un término definido que el corredor puede extender los efectos del contrato de corretaje. No podría ser de otra forma, porque lo contrario sería reconocer al corredor un gravamen indefinido sobre la venta del bien con una persona con la cuál interactuó el corredor en un momento dado. Ello sería irrazonable.
No incluir la cláusula de extensión podría crear una controversia con el cliente sobre el pago de la comisión cuando la compraventa se genera con posterioridad al ven-cimiento del contrato de corretaje. Cintrón Perales, op. cit, pág. 61. En el contrato ante nuestra consideración no exis-tió cláusula de extensión alguna. No obstante, el corredor debía conocer el alcance y propósito de este tipo de cláu-sula, ya que en dos contratos con otros clientes la incorporó. Estos contratos fueron sometidos junto a la so-licitud de la sentencia sumaria de los recurridos.
Tras todo este análisis, concluimos que todos los contratos de corretaje deben tener fecha de vigencia o de vencimiento. Reiteramos que, como norma general, el corredor adquiere el derecho a recibir comisión una vez se celebre un contrato entre su cliente y un tercero adquiriente, durante la vigencia del contrato de corretaje de bienes raíces. Cuando este contrato no tiene una cláusula de extensión, expira y al poco tiempo se celebra la compraventa, el corredor tiene derecho a recibir la compensación si prueba que él consiguió al comprador listo, dispuesto y *375 capaz. El corredor debe probar que fue él quien llevó a las partes a las negociaciones y quien medió para el resultado logrado. Por otro lado, el corredor también tiene el derecho a una compensación si prueba que no consiguió el perfec-cionamiento de la compraventa por mala fe, fraude o culpa del vendedor. En ausencia de alguna de estas circunstan-cias el corredor no recibirá compensación alguna.
En este caso, existe controversia sobre si el contrato entre las partes tenía una fecha de vencimiento. Igualmente, existe controversia de hechos acerca de si el señor Rodríguez Vélez fue el promotor de la compraventa que se generó y sobre el porcentaje de compensación que las partes estipularon. La parte peticionaria insistió en que la comisión pactada fue de 5% y, por el contrario, la parte recurrida estimó que acordaron un 4% del precio de venta. Es sabido que procede dictar sentencia sumaria sólo en los casos en que no existe controversia de hechos relevantes para la resolución del caso. Ramos Pérez v. Univisión, 178 D.P.R. 200 (2010). Ante los múltiples hechos esenciales en controversia en este caso, no se puede emitir urna sentencia sumaria.
IV
Por todo lo expuesto, se revoca la sentencia del Tribunal de Apelaciones, Región Judicial de San Juan. Ante la pre-sencia de controversias que involucran cuestiones de credi-bilidad no adjudicadas, devolvemos el caso al Tribunal de Primera Instancia para que evalúe si el contrato de servi-cios de bienes raíces tuvo un término de vencimiento. De no tenerlo, el tribunal debe concluir que ese contrato fue nulo.
Ahora bien, si el tribunal concluye que el contrato tuvo un término de seis meses, debe evaluar si el corredor aban-donó su encomienda o si fue él quien llevó al vendedor y al tercero a contratar. Para ello, el tribunal debe evaluar la *376 cadena de eventos que condujo a la negociación. Además, de no haber sido el corredor quien procuró la venta, el tribunal deberá evaluar si ello no ocurrió por fraude o mala fe del vendedor o principal. Si hubo mala fe o fraude, el co-rredor tendrá derecho a una compensación razonable, co-rrespondiente a sus esfuerzos. Finalmente, si concluye que el corredor tiene derecho contractual a una compensación, el foro primario deberá estimar cuál fue el porcentaje de compensación acordado entre las partes, ya que eso tam-bién está en controversia.

Se dictará sentencia de conformidad.

La Juez Asociada Señora Rodríguez Rodríguez concu-rrió y disintió con una opinión escrita, a la que se unió el Juez Presidente Señor Hernández Denton. La Jueza Aso-ciada Señora Fiol Matta concurrió sin opinión escrita.
Opinión concurrente y disidente emitida por la Juez Aso-ciada Señora Rodríguez Rodríguez, a la que se une el Juez Presidente Señor Hernández Denton.
La opinión mayoritaria en este caso concluye, luego de una interpretación forzada del Artículo 31 de la Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico (Ley para Reglamentar el Negocio de Bienes Raíces), Ley Núm. 10 de 26 de abril de 1994 (20 L.P.R.A. sec. 3025 et seq.) (Ley 10), que todo contrato de corretaje tiene que tener una fecha de vencimiento para su eficacia. En otras palabras, esta opinión establece que tal requisito es de ca-rácter constitutivo no tan sólo para los contratos de corre-taje exclusivo y semiexclusivo como exige la ley, sino que, mediante fíat judicial, ahora es exigible a los contratos abiertos.
No comparto el razonamiento que utiliza el Tribunal *377 para llegar a su conclusión por varias razones. Primero, considero que la ley que se interpreta no adolece de falta de claridad y que tanto su texto como su historial patenti-zan que la intención del legislador fue regular sólo los con-tratos de corretaje exclusivo y semiexclusivo dejando fuera del requisito aquí impuesto los contratos de corretaje abierto. Segundo, la interpretación del Tribunal es ajena y, como tal, contraria a la naturaleza misma del contrato de corretaje abierto. Es por ello que disiento del curso trazado por la mayoría del Tribunal.
Por otro lado, es menester señalar que, al igual que el tribunal, considero que existen controversias sobre hechos esenciales que impiden que este caso sea resuelto por la vía sumaria, por lo cual concurro con esta determinación.
I
En nuestra jurisdicción, la doctrina reconoce varios ti-pos de contratos de corretaje de bienes raíces. Los contra-tos principales son: (1) de corretaje exclusivo; (2) de corre-taje semiexclusivo; (3) de corretaje abierto. R.A. Cintrón Perales, El contrato de corretaje de bienes raíces y de op-ción de compraventa de propiedades residenciales, San Juan, Ed. Situm, 2006, pág. 85. La doctrina también reco-noce el contrato de corretaje con acuerdo neto y el contrato de subcorretaje o “co-broking”. El primero se refiere a una modificación en la forma de remuneración del corredor y el segundo, a un acuerdo de cooperación entre dos o más co-rredores para llevar a cabo determinada transacción de bienes raíces. Id., pág. 91.
En los contratos de corretaje exclusivo y semiexclusivo, “el dueño de una propiedad le concede al corredor la auto-rización única y exclusiva para actuar como intermediario en una representación de éste para ofrecer, promocionar y negociar determinada transacción de bienes raíces”. Cin-trón Perales, op. cit., págs. 85-86. Ambos contratos se di *378 ferencian en que, en los semiexclusivos, el propietario no renuncia al derecho de “realizar gestiones para perfeccio-nar la transacción de bienes raíces por sí mismo”. Id. La exclusividad no se presume, por lo que, para que tal renun-cia sea válida y el contrato goce de plena exclusividad, así debe pactarse expresamente en el contrato de corretaje, íd., pág. 87; D. Barlow Burke, Jr., Law of the Real State Brokers, 3ra ed., Nueva York, Ed. Aspen, 2009, Sec. 2.02(B), págs. 2-30 (discute, a esos efectos, jurisprudencia estadounidense de los tribunales estatales).
En cambio, en los contratos de corretaje de tipo abierto, “el dueño de la propiedad se reserva la facultad de contra-tar el número de corredores de bienes raíces que desee”. Cintrón Perales, op. cit., págs. 88-89. Es decir, durante la vigencia del contrato abierto, el oferente no está impedido de dirigirse a otros corredores con el propósito de asignarle la misma encomienda que le fuera asignada anteriormente a otro corredor. De ahí que “el derecho a exigir el pago de la comisión será de aquel corredor que haya sido quien pro-curó que se perfeccionara la transacción de bienes raíces (procuring cause)”. Id., págs. 88-89. Este tipo de contrato es de carácter informal y se utiliza comúnmente en tran-sacciones que involucran propiedad comercial, o incluso re-sidencial, cuando el propietario necesita disponer de éstas con premura, pues al no estar atado a un solo corredor se multiplican las posibilidades de conseguir un comprador. Véase Barlow Burke, op. cit., Sec. 2.02(A), págs. 2-24.
Por otra parte, el negocio de corretaje está regulado de forma específica en nuestro ordenamiento por la Ley Núm. 10. Con su adopción, se agruparon en una sola ley todas las disposiciones legales pertinentes al negocio de bienes raí-ces existentes hasta ese entonces. Además, se dispuso un cuerpo reglamentario nuevo y más estricto con el fin de beneficiar a los consumidores y a los vendedores, corredo-res o empresas de bienes raíces. Véanse: Exposición de Mo-tivos de la Ley para Reglamentar el Negocio de Bienes Raí- *379 ces, 1994 (Parte 1) Leyes de Puerto Rico 44; Vélez v. Izquierdo, 162 D.P.R. 88, 95 (2004).
La ley se refiere a distintos tipos de contratos de corre-taje, pero no incluye los contratos de corretaje de tipo abierto. De esta falta de reglamentación, el Tribunal con-cluye que la ley es confusa, embarcándose en un tortuoso viaje de interpretación judicial para “aclarar” la “confusión”. Sostengo que la ausencia de referencia en la ley del contrato de tipo abierto es indicativo de que la Le-gislatura no quiso imponerle a estos tipos de contratos in-formales los mismos requisitos que a los contratos de na-turaleza exclusiva y semiexclusiva.
Así, entre los actos o las prácticas específicas proscritas por la Ley para Reglamentar el Negocio de Bienes Raíces, la ley menciona que:
Se prohíbe a toda persona sujeta a las disposiciones de [esta ley] a incurrir, o inducir a otra persona a incurrir, en cual-quiera de los actos o prácticas que se enumeran a continua-ción:
(9) Realizar con cualquier parte un contrato de corretaje exclusivo o semi exclusivo, sin explicarle los términos y condi-ciones del mismo, y su fecha de vencimiento; disponiéndose, que no serán permitidas las cláusulas de renovación automá-ticas en los contratos de corretaje. (Énfasis suplido.) 20 L.RR.A. sec. 2054(a)(9).
Nótese que la ley es clara al exigir que los contratos de corretaje exclusivo y semiexclusivo contengan “fecha de vencimiento”. Lo cierto es que los contratos de corretaje de tipo abierto no eran desconocidos en la doctrina a la fecha cuando se aprobó la Ley 10, por lo que su omisión en ésta fue un acto consciente y no un mero olvido o algo que apunte a confusión.
Ello no obstante, la mayoría de esta Curia considera que ese texto es confuso, razón por la cual estima necesario interpretar el significado del texto legislativo. Considero que es innecesario embarcarse en una travesía interpreta- *380 tiva en búsqueda de la intención legislativa. Veamos en mayor detalle.
II
A. La opinión del Tribunal parte de una apreciación equivocada acerca del contenido de la Ley 10 al presumir que ésta trata de igual forma a todos los tipos de contratos de corretaje y que no crea distinción alguna entre éstos. Tal presunción es incorrecta, ya que en instancias determi-nadas, la ley alude específicamente a tipos de contratos en particular con el propósito de sumar exigencias y garanti-zar un mayor grado de certidumbre para el consumidor de servicios. Tal es el caso de los contratos exclusivos, semiex-clusivos y con acuerdo neto. En la medida que la ley reco-noce la existencia de distintos tipos de contratos de corre-taje, se patentiza que la ausencia de uno de estos tipos de contrato en la ley fue determinación consciente.
Por ejemplo, y como ya vimos, al enumerar los actos o las prácticas proscritas en la profesión de corredor o ven-dedor de bienes raíces, el legislador prohibió claramente en el artículo que interpretamos, “realizar con cualquier parte un contrato de corretaje exclusivo o semi exclusivo, sin ex-plicarle los términos y condiciones del mismo, y su fecha de vencimiento”. (Énfasis suplido.) 20 L.P.R.A. sec. 3054(a)(9). Así también, el Artículo 31(16), supra, distinguió los con-tratos de corretaje con acuerdo neto cuando proscribió: “Previo al otorgamiento de un contrato de corretaje o lis-tado neto, no orientar adecuadamente al cliente sobre el alcance de la transacción y la conveniencia de utilizar los servicios de un tasador profesional”. (Énfasis suplido.) 20 L.P.R.A. sec. 3054(a)(16). Como bien se puede apreciar, no todos los tipos de contrato reciben el mismo trato. Al utili-zar la terminología típica de la profesión de corretaje, re-sulta evidente que el legislador pretendió dar tratamiento disímil a los distintos tipos de contratos de corretaje.
*381 Como ya adelantamos, en los contratos exclusivos y se-miexclusivos, el dueño de la propiedad se obliga a no fir-mar otros contratos de corretaje con otros corredores. Cin-tron Perales, op. cit., pág. 86. Asimismo, mediante pacto expreso, el propietario tiene la opción de renunciar al de-recho de realizar gestiones a fines de llevar a cabo transac-ciones de bienes raíces por sí mismo. En este tipo de con-trato el propietario limita las actividades que puede llevar a cabo para disponer de su propiedad. Id. Es por ello que se hace necesario que se le incluyan limitaciones como la fe-cha de vencimiento, habida cuenta que, con este tipo de contrato, el propietario está impedido de disponer de su propiedad por su cuenta. El propietario no puede realizar gestiones por sí mismo a los fines de concretar determi-nada transacción de bienes raíces. Estas limitaciones a lo que es su derecho propietario, justifican la exigencia de fecha de vencimiento en este tipo de contrato. Así lo enten-dió el legislador en su momento y ello surge claramente del texto de la Ley 10 y, como veremos, de las leyes y los regla-mentos que le precedieron.
Por el contrario, los contratos de corretaje abierto otor-gan mayor flexibilidad al dueño que pretende disponer de su propiedad, permitiéndole contratar con varios corredo-res de bienes raíces de forma simultánea. Es decir, la na-turaleza flexible de los contratos de corretaje abierto per-mite que éstos no requieran un plazo de vigencia ya que “el dueño de la propiedad se reserva la facultad de contratar el número de corredores de bienes raíces que éste desee”. Cintrón Perales, op. cit., pág. 88. Esto permite que en caso de que el propietario no esté conforme con las ejecutorias del corredor o desee agilizar la transacción, por ejemplo, explore otras alternativas a fines de concretar sus objetivos.
Es la naturaleza misma de estos dos tipos de contrato de corretaje lo que justifica y explica su trato disímil por el legislador, pero que la mayoría ignora.
*382 B. A pesar de que una lectura integral de la Ley 10, deja establecido que el legislador distinguió entre los tipos de contratos de corretaje, el Tribunal se embarca en una infructuosa expedición interpretativa a través de varias le-yes y reglamentos derogados por la Ley Núm. 10, para en-contrar allí soporte para su teoría. Véanse: Ley para Re-glamentar la Profesión de Corredor de Bienes Raíces en Puerto Rico, Ley Núm. 139 de 14 de junio de 1980 (1980 Leyes de Puerto Rico 544); Reglamento Núm. 1639 del De-partamento de Justicia, Reglamento sobre Competencia Justa Número V (Regulando en Puerto Rico el Negocio de Bienes Raíces en Puerto Rico), 8 de febrero de 1973; Ley para Reglamentar la Venta en la Isla de Bienes Raíces fuera de Puerto Rico, Ley Núm. 145 de 18 de junio de 1980 (1980 Leyes de Puerto Rico 588); Reglamento 1375 del De-partamento de Justicia, Reglamento sobre Competencia Justa Núm. IV (Regulando en Puerto Rico la Venta de Te-rrenos Localizados Fuera de Puerto Rico), 25 de septiem-bre de 1970.
Como parte de esta búsqueda, la mayoría comienza ci-tando el Artículo 8(Z)(3) de la derogada Ley Núm. 145, el cual prohibía “ofrecer vender o vender solares sin especifi-car en el contrato de venta ... el término de duración de dicho contrato, incluyendo específicamente la fecha de vencimiento”. (Énfasis suplido.) Art. 8(Z)(3) de la Ley Núm. 145 de 18 de jimio de 1980 (1980 Leyes de Puerto Rico 596). Tal como la opinión del Tribunal reconoce, el venci-miento al que hace referencia este inciso no versa sobre la relación de corretaje entre el propietario y el agente corre-dor, sino sobre el contenido del contrato de compraventa de una propiedad. Por tal razón, su sola mención resulta im-pertinente a la luz de la controversia que nos ocupa. Más aún, no concibo cómo este Foro puede llegar a concluir que el Artículo 31(9) de la Ley 10 “parece ser el producto” del Artículo 8(Z)(3) de la Ley Núm. 145 debido a que este úl-timo utiliza la palabra “vencimiento”.
*383 Además, lo cierto es que esta cláusula se incluyó, casi en su totalidad, en el texto de la Ley 10, pero para referirse al contenido del contrato de compraventa y no a la relación de corretaje entre el agente y el propietario. Dispone la Ley 10, en su Artículo 32(a)(ll)(B):
(a) Actos o prácticas proscritas a vendedores, corredores y empresas en la venta de bienes inmuebles localizados fuera de Puerto Rico:
(11) Ofrecer [a] vender o vender solares sin especificar en el contrato de venta lo siguiente:
(A) Todo lo relacionado ....
(B) Quien acarreará la deuda contributiva durante el período de tiempo en que se estén pagando los plazos adecua-dos para la compra de dicho solar y si ésta recayer[e] sobre el comprador, la porción del total de la mensualidad adecuada que se dedicara a este concepto, un desglose en forma deta-llada de los conceptos a los cuales será aplicada la mensuali-dad y el término de duración de dicho contrato, incluyendo específicamente, la fecha de vencimiento. (Enfasis suplido y corchetes en el original.) 20 L.P.R.A. sec. 3055(a)(ll)(B).
Con lo cual, no logro comprender cómo la mayoría llega a su conclusión.
Por otra parte, la opinión mayoritaria cita el texto del inciso (23) del Artículo V del derogado Reglamento sobre Competencia Justa Núm. V, supra. El referido reglamento fue aprobado mediante la Ley para Prohibir las Prácticas Monopolísticas y Proteger la Justa y Libre Competencia en los Negocios y el Comercio, Ley Núm. 77 de 25 de junio de 1964, con el propósito de “regular las transacciones que [involucraban] bienes raíces localizados en el Estado Libre Asociado de Puerto Rico”. Art. II del Reglamento sobre Competencia Justa Núm. V, supra, pág. 1. A esos efectos, el reglamento prohibía “concertar con cualquier cliente un contrato autorizando que el corredor o vendedor [actuara] como el agente exclusivo en la venta de dicha propiedad sin antes informar al cliente sobre el alcance de dicha exclusividad”. (Enfasis suplido.) Art. V(a)(23) del Regla-mento sobre Competencia Justa Núm. V, supra, pág. 13.
*384 Como sabemos, uno de los objetivos de la Ley 10 fue agrupar la legislación anterior que regulaba el negocio de bienes raíces. A tales fines, el legislador trasladó casi in-tactas varias disposiciones contenidas en leyes derogadas. De hecho, en el anteproyecto de la Ley 10, se utilizó un lenguaje muy parecido al del mencionado artículo V del Reglamento Núm. V, al disponer: “[c]oncertar con cual-quier cliente un contrato de corretaje exclusivo o semi ex-clusivo, sin explicarle sobre los alcances de esta exclusivi-dad o semi exclusividad o no indicar en dicho contrato la fecha de expiración del mismo.” (Énfasis suplido.) R del S. 300 de 30 de abril de 1993, Ira Sesión Ordinaria, 12ma Asamblea Legislativa, pág. 25.
Es pertinente señalar que el referido anteproyecto sólo fue modificado en su versión final para “simplificar las prácticas prohibidas por [la Ley 10]”, mas no por motivos adicionales que pudieran ahora trastocar la interpretación del texto utilizado en el anteproyecto. R del S. 300 de 30 de abril de 1993, 2da Sesión Ordinaria, 12ma Asamblea Le-gislativa, Informe Conjunto presentado por la Comisión de Gobierno, de Vivienda y de Asuntos del Consumidor, 18 de octubre de 1993, pág. 8.
El Artículo 31(9) de la Ley 10 tiene su génesis en el texto del Reglamento Núm. V. Su incorporación a la Ley 10 manifiesta que el legislador, históricamente, ha procurado estatuir mayores limitaciones para los contratos con acuer-dos de exclusividad, omitiendo extenderlas a los contratos abiertos. Asimismo, ambas disposiciones demuestran un interés del legislador en que el consumidor conozca el al-cance de la exclusividad. No veo, entonces, de dónde surge la “confusión” que invoca la opinión del Tribunal.
La ponencia hace referencia a una de varias enmiendas realizadas a la Ley 10.(1) En específico, discute la Exposi- *385 ción de Motivos de la Ley Núm. 271 de 6 de octubre de 1998 (1998 (Parte 2) Leyes de Puerto Rico 1285) —que pro-hibió las cláusulas de renovación automática en los contra-tos de corretaje— para concluir que todos los contratos de corretaje, aun los de tipo abierto, tienen que tener fecha de vencimiento. En lo pertinente, la Exposición de Motivos dispone:
La Ley Núm. 10 de 26 de abril de 1994 tuvo el propósito, entre otros, de reglamentar el negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresas de Bienes Raíces en Puerto Rico. [É]sta logró agrupar todas las disposiciones legales existentes en el campo de las Bienes Raíces, resul-tando en beneficio de los consumidores, así como también de los Vendedores, Corredores y Empresas de Bienes Raíces. Ac-tualmente uno de los aspectos más importantes en una nego-ciación de bienes raíces es la relación contractual que se esta-blece con el cliente. Estas negociaciones se formalizan comúnmente mediante “contratos de corretaje” que deben dis-poner de un término fijo de tiempo donde un corredor tiene los derechos para la venta de una propiedad. (Enfasis suplido.) Exposición de Motivos de la Ley Núm. 271, supra, pág. 1285.
A base del texto citado, el Tribunal concluye que debido a que “comúnmente” las negociaciones entre el propietario y el corredor se formalizan mediante contratos sujetos a un término fijo, el legislador quiso establecer que todo con-trato de corretaje contenga una disposición a esos efectos. De igual forma, presume que la Asamblea Legislativa no hubiera aprobado esta enmienda si no hubiera entendido que por disposición de la Ley 10, todo contrato de corretaje, aun los de tipo abierto, requerían fecha de vencimiento como requisito para su validez. Por consiguiente, de una mención general y ejemplificativa plasmada en una en-mienda, el Tribunal deduce, livianamente, que el legisla-dor tuvo la intención de que el Artículo 31(9) de la Ley 10 *386 aplicara a los contratos abiertos, incluso desde su aproba-ción en 1994. No comparto este método de interpretación que se trasluce de la opinión del Tribunal.
Es cierto que a través de esa enmienda la Asamblea Legislativa prohibió las cláusulas de renovación automática. Sin embargo, no es menos cierto que, como cuestión de lógica, ello no excluye que las partes —en el ejercicio de su libertad contractual— suscriban un contrato abierto sin estar sujeto a un término fijo.
Cabe destacar que la enmienda fue aprobada con poste-rioridad a la suscripción del contrato de autos, hecho reco-nocido por la opinión mayoritaria. Si bien no existe impe-dimento para considerar una legislación posterior con el fin de interpretar el alcance de una legislación anterior, “una expresión contenida en una ley enmendatoria [sic] explicando cuál fue la intención legislativa al aprobar la ley objeto de enmienda no es definitiva con carácter retro-activo ni desvirtúa la interpretación que a la ley original haya dado este Tribunal”. Morales v. Adm. Sistemas de Retiro, 123 D.P.R. 589, 596 esc. 3 (1989). Véase Nadal v. Depto. Rec. Nat., 150 D.P.R. 715 (2000). De forma análoga, una expresión ejemplificativa contenida en la exposición de motivos de una ley enmendadora, refiriéndose a uno de varios supuestos contractuales cobijados por la ley original, no debe utilizarse como punta de lanza para realizar modificaciones con carácter retroactivo, o pasar por alto la claridad del texto legislativo.
El curso interpretativo que traza el Tribunal, sin más, no es fundamento adecuado para el resultado propuesto. Tanto la Ley 10 como sus antecedentes, demuestran que la Asamblea Legislativa y los distintos organismos del Ejecu-tivo han optado por excluir los contratos de corretaje abierto en todas las instancias en las que se ha requerido desglosar tanto sus términos y condiciones como la fecha de vencimiento. Parecería más razonable, a mi juicio, como técnica interpretativa, que concluyésemos que el legislador *387 eximió a los contratos de corretaje de carácter abierto del requisito de fecha de vencimiento.
En ausencia de fundamentos jurídicos adecuados, este Tribunal no debe excederse en el ejercicio de su función interpretativa del Derecho. Concluir que el texto del Artí-culo 31(9) —según su redacción actual— fue aprobado con la intención de que aplicara a los contratos de corretaje abierto no es más que un ejercicio de legislación judicial.
Por los fundamentos expresados, disiento del criterio mayoritario.

 Esta doctrina se adoptó en Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, New York, Nevada, Texas, entre otros estados. D. Barlow Burke, Jr., Law of Real State Brokers, 3era ed., Nueva York, Aspen Pubs., 2009, Sec. 5.02, págs. 5.2-5.9. Los estados que no acogen esa doctrina recurren a la norma de “no closing, no commission” que nació en el caso Ellsworth Dobbs, Inc. v. Johnson, 236 A.2d 843 (1967). Estados como Massachuttes, Kansas, Idaho, Nebraska, Oregon y Vermont adoptaron esta regla. Barlow Burke, op. cit., Secs. 6.01-6.04, pág. 6.1-6.68. Véanse: Dworak v. Michals, 320 N.W. 2d 485 (1982); Tristram’s Landing, Inc. v. Wait, 327 N.E. 2d 727 (1975); Winkelman v. Allen, 519 P.2d 1377 (Kan. 1974); Setser v. Commonwealth, Inc., 470 P.2d 142 (Or. 1970); Staab V. Messier, 264 A.2d790 (1970).

 Cabe señalar que el Artículo 31 de la Ley Núm. 10 (20 L.P.R.A. see. 3054) ha sido enmendado luego de su aprobación en tres ocasiones: 1998,1999 y 2006. El texto *385 de la primera oración del Artículo 31(9) no fue alterado en ninguna de esas tres instancias. 20 L.P.R.A. see. 3054(9).